HURWITZ, Circuit Judge,
concurring in part and concurring in the result:
Clark Elmore committed a truly monstrous crime. A state that has chosen to impose thé death penalty can surely reserve it for such an offense.
But, before the state can impose that sentence, Elmore is entitled under the Sixth Amendment to effective assistance of counsel. I doubt that he received competent representation. His lawyer, who had never before handled a capital case, advised Elmore to plead guilty without receiving any agreement as to sentence in return.[1] The lawyer allowed Elmore to appear in shackles at his first appearance before the sentencing jury. The one-hour mitigation presentation consisted entirely of unconvincing attempts to prove through court personnel that Elmore was remorseful. And, counsel never investigated whether this senseless crime was at least in part the product of Elmore’s organic brain damage.
. But under AEDPA, my serious doubt as to whether the Sixth Amendment was honored is not enough. Rather, we are constrained to view counsel’s performance and the state court’s denial of relief through a “doubly deferential” lens. Knowles v. Mirzayance, 556 U.S. 111, 123, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009); Clark v. Arnold, 769 F.3d 711, 715 (9th Cir.2014). Applying that forgiving standard, I concur in the panel opinion insofar as it concludes that the Washington Supreme Court did not unreasonably determine that Elmore failed to establish constitutional prejudice from either the guilty plea or the shackling. And, although defense counsel plainly fell below the applicable standard of care in not investigating Elmore’s brain damage, I cannot conclude that the state court unreasonably determined that there is no reasonable probability that a proper investigation would have changed the outcome. Thus, I agree that the death penalty must stand.
I.
The majority holds that the Washington Supreme Court reasonably rejected El-more’s ineffective assistance of counsel claim relating to brain damage because the decision to present a limited mitigation case was a “legitimate strategy.” But we evaluate strategy “in terms of the adequacy of the investigations supporting” it. Wiggins v. Smith, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); see also Mann v. Ryan, 774 F.3d 1203, 1217-18 (9th Cir.2014). Elmore’s lawyer con *1175 ducted no brain damage investigation, and candidly admitted that he failed to do so because of inexperience, not strategy.
The Supreme Court has emphasized that in preparing a death penalty mitigation defense, “counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.” Wiggins, 539 U.S. at 521, 123 S.Ct. 2527 (quoting Strickland v. Washington, 466 U.S. 668, 691, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)); see also Mann, 774 F.3d at 1216 (“[Cjounsel has an obligation at the penalty phase to conduct a thorough investigation of the defendant’s background.” (internal quotation marks omitted)). This duty exists wholly apart from the strategic decision about what evidence to present in the mitigation case. See Wiggins, 539 U.S. at 521-23, 123 S.Ct. 2527. The adequacy of counsel’s investigation is determined by “prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel’s perspective at the time.” Id. at 523, 123 S.Ct. 2527 (quoting Strickland, 466 U.S. at 688-89, 104 S.Ct. 2052) (citation and internal quotation marks omitted).
The prevailing professional norms in 1995 plainly required an investigation into brain damage. The American Bar Association Guidelines have been repeatedly cited by the Supreme Court as “ ‘guides to determining what is reasonable’ ” in capital litigation defense. Wiggins, 539 U.S. at 524, 123 S.Ct. 2527 (quoting Strickland, 466 U.S. at 688, 104 S.Ct. 2052). The Guidelines require death penalty counsel to investigate “all reasonably available mitigating evidence,” including specifically whether the client had suffered any mental injuries or has cognitive limitations. ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1 (1989). Consistent with the Guidelines, several death penalty experts submitted declarations stating that reasonable death penalty counsel would have investigated the possibility that Elmore had brain damage. Those declarations were uncontroverted, and for good reason; we and our sister Circuits have repeatedly treated brain damage as a central consideration in death penalty mitigation defense. See, e.g., Mann, 774 F.3d at 1217-18; Littlejohn v. Trammell, 704 F.3d 817, 860 (10th Cir.2013); Frierson v. Woodford, 463 F.3d 982, 989 (9th Cir.2006); Jacobs v. Horn, 395 F.3d 92, 102-03, 107 (3d Cir.2005).
The evidence in this case plainly “would have led a reasonably competent attorney to investigate further” about brain damage. Wiggins, 539 U.S. at 534, 123 S.Ct. 2527. Elmore’s background was replete with toxin exposure — he grew up near an airport used for crop dusting, was exposed to Agent Orange while serving in Vietnam, and had extensive contact with toxic materials while working on oil pipelines and with automobiles. Counsel was also aware that Elmore had suffered various head injuries, including a blow to the head from an ax. Both mental health experts who examined Elmore testified that they would have recommended neurological testing had they been apprised of El-more’s history. And, a death penalty expert who consulted with counsel specifically recommended brain damage testing. Yet defense counsel did nothing. “[AJny reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses.... ” Id. at 525, 123 S.Ct. 2527; see also Mann, 774 F.3d at 1217 (“ ‘When tantalizing indications in the record suggest that certain mitigating evidence may be available, those leads must be pursued.’ ” (quoting Lambright v. Schriro, 490 F.3d 1103, 1117 (9th Cir.2007)) (alteration omitted)).
*1176 Counsel not only failed to undertake any brain damage investigation, but offered no explanation for this omission other than inexperience.[2] That admission, although admirably forthright, cannot justify forgoing investigation. See Wiggins, 539 U.S. at 526, 123 S.Ct. 2527 (finding ineffective assistance in part because counsel’s “failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment”); Williams v. Taylor, 529 U.S. 362, 395, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (finding ineffective assistance in part because the failure to investigate was “not because of any strategic calculation but because [counsel] incorrectly thought that state law barred access to [relevant] records”).
The state court’s conclusion that counsel’s representation met prevailing norms was thus flatly inconsistent with clearly established Supreme Court law. See 28 U.S.C. § 2254(d)(1) (allowing habeas relief if a state court decision is “contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States”). And, the majority’s conclusion that counsel’s oversight can be excused as “strategy” is in direct tension with our recent decision in Mann. In that case, we squarely held that the state court unreasonably determined that counsel’s failure to investigate brain damage did not fall below an objective standard of reasonableness:
[C]ounsel could not have made a reasoned strategic decision to not present mitigating evidence regarding Mann’s organic brain damage or other life history because he did not even attempt to explore that evidence. Rather, the record suggests that his failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment.
774 F.3d at 1218 (alterations and internal quotation marks omitted). No different conclusion can be reached here.
Although “strategic choices made after thorough investigation of law and facts ... are virtually unchallengeable,” Strickland, 466 U.S. at 690, 104 S.Ct. 2052, “strategy” is not a talisman that insulates ineffective representation from constitutional norms, see Wiggins, 539 U.S. at 521, 533-34, 123 S.Ct. 2527 (rejecting counsel’s argument that their “strategic” conduct was effective assistance because their investigation did not “reflect reasonable professional judgment”). “An uninformed strategy is not a reasoned strategy.... It is, in fact, no strategy at all.” Mann, 774 F.3d at 1218 (quoting Correll v. Ryan, 539 F.3d 938, 949 (9th Cir.2008)) (internal quotation marks omitted).
Counsel’s failure to investigate brain damage was plainly not effective representation. A state that chooses to impose capital punishment owes a defendant more. Even when scrutinized with AEDPA deference, the state court’s determination to the contrary was unreasonable.
II.
But, even when counsel’s performance falls below the applicable standard of care, a successful ineffective assistance claim also requires proof of prejudice. See Strickland, 466 U.S. at 687, 104 S.Ct. 2052. “[T]o establish prejudice, a ‘defendant must show that there is a reasonable probability that, but for counsel’s unprofession *1177 al errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.’ ” Wiggins, 539 U.S. at 534, 123 S.Ct. 2527 (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052). And, under AEDPA, I am required to review with deference the state court’s decision that Elmore was not prejudiced by the failure to present brain damage evidence at the penalty'trial.[3] I am unable to conclude that the state court unreasonably determined on the record before it that there was no prejudice.
In the state post-conviction review proceedings, both Elmore and the State submitted evidence about brain damage. In reviewing this evidence, the Washington Supreme Court stated that the “expert witnesses did not agree on whether, or to what extent, Elmore’s mental deficiencies affected his ability to conform to lawful behavior.” In re Elmore, 162 Wash.2d 236, 172 P.3d 335, 347 (2007) (en banc). This characterization of the evidence was accurate. Elmore’s experts testified that he suffered from some form of brain damage, and that this brain damage could have influenced his decision-making during the murder. These experts also .concluded, however, that Elmore’s brain damage did not prohibit him from functioning in society. Indeed, one neuropsychologist stated: “Mr. Elmore was able to tell right from wrong at the time of the crime. He knew the nature and quality of his act. He was not insane.”
The State’s expert, although agreeing that Elmore likely suffered from brain damage, flatly testified that any neurological impairments did not contribute to the crime. He explained that “there was a great deal of evidence right around and at the time of the crime that indicated that Mr. Elmore was calm, calculating, able to conform his conduct with requirements for the law, and that he took rather significant measures prior to the crime and during the crime to cover it up.”
To be sure, because no “causal nexus” is required between the defendant’s proffered mitigation and the crime, see Hurles v. Ryan, 752 F.3d 768, 784-85 (9th Cir.), cert. denied, — U.S.-, 135 S.Ct. 710, 190 L.Ed.2d 461 (2014), this brain damage evidence would have been admissible during the sentencing trial had counsel pursued a competent investigation. But, given the absence of a causal nexus, the equivocal nature of the evidence, the State’s contrary expert, the horrific nature of the crime, Elmore’s attempts to cover it up, and the uncontested evidence that he functioned well on the job and in society in general, I cannot find unreasonable the state court’s conclusion that Elmore failed to establish a reasonable probability that the outcome would have been different had counsel performed competently. Because constitutional ineffective assistance requires both performance below professional norms and a reasonable probability of prejudice, I concur in the denial of the *1178 ineffective assistance of counsel claim as to brain damage.

. " '[PJleading guilty without a guarantee that the prosecution will recommend a life sentence holds little if any benefit for the defendant.’ ” Florida v. Nixon, 543 U.S. 175, 191 n. 6, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004); see also Gary Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U. L.Rev. 299, 331-32 (1983) (explaining the benefit of conducting a guilt phase trial in capital cases even “where overwhelming evidence of guilt exists," and noting compatibility of this approach with a penalty phase remorse defense).

. Counsel had never represented a death penalty defendant prior to Elmore, and he had never retained a neuropsychologist or neurologist in his previous criminal defense work. He testified that "unless identification of signs or symptoms of traumatic brain injury were covered” in one of the death penally seminars that he attended, “he did not recall ever having received such training.”

. As the panel notes, the Washington Supreme Court appeared to conflate the mental health and brain damage issues. It is also unclear whether the Washington Supreme Court expressly reached the Strickland prejudice prong with respect to the brain damage investigation. We must, however, apply AED-PA deference unless it is clear that "the state court has not decided an issue.” Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir.2006); see also Woodford v. Visciotti, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam) (noting that AEDPA’s deferential standard of review requires that state court opinions "be given the benefit of the doubt”). I therefore must assume that the state court found that there was no constitutional prejudice from the failure to introduce brain damage evidence, and review that finding deferentially under AEDPA.