

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| RICARDO JOSE LOPEZ, | No. 19-16973 |
| Petitioner-Appellee, | D.C. No. 3:11-cv-00635-MMD-CBC |
| v. | |
| ATTORNEY GENERAL FOR THE STATE OF NEVADA; TIMOTHY FILSON, AKA Renee Baker, | MEMORANDUM[*] |
| Respondents-Appellants. | |

Appeal from the United States District Court
for the District of Nevada
Miranda M. Du, Chief District Judge, Presiding

Argued and Submitted February 2, 2021
San Francisco, California

Before: THOMAS, Chief Judge, and IKUTA and NGUYEN, Circuit Judges.
Dissent by Judge IKUTA

Respondents appeal the district court's decision granting Lopez's petition

for a writ of habeas corpus based on ineffective assistance of counsel at the penalty

phase of his trial, at which he was sentenced to life imprisonment without the

---

[*] This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

possibility of parole. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 28 U.S.C. § 2253, and we affirm. Because the parties are familiar with the facts of this case, we need not recount them here.

We review a district court's decision to grant a petition for a writ of habeas corpus and a district court's application of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254, de novo. *Lambert v. Blodgett*, 393 F.3d 943, 964–65 (9th Cir. 2004). Under AEDPA, federal courts may not grant a petition for a writ of habeas corpus on behalf of a person in state custody "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1). We apply this standard to the Nevada Supreme Court's decision, which was the last reasoned decision of the state courts on the merits of the petitioner's claim. *Barker v. Fleming*, 423 F.3d 1085, 1091–93 (9th Cir. 2005).

Absent AEDPA deference, ineffective assistance of counsel claims are mixed questions of law and fact, which we review de novo. *Rhoades v. Henry*, 638 F.3d 1027, 1034 (9th Cir. 2011). To prevail on his ineffective assistance of counsel claim, Lopez "must show that counsel's performance was deficient" and

"that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

1.      The Nevada Supreme Court did not address whether Lopez's counsel's performance was deficient, so we review that issue de novo. *Porter v. McCollum*, 558 U.S. 30, 39 (2009). The district court correctly concluded that Lopez established that his counsel's performance was deficient.

Lopez asserts that he received ineffective assistance of counsel at the penalty phase of his trial based on his counsel's failure to present evidence from Dr. John Paglini, a clinical psychologist who had evaluated Lopez at the request of his previous counsel and prepared a detailed report, which described the neglect and severe physical abuse Lopez suffered as a child and opined on the causes of Lopez's conduct, his mental health, and his risk of future dangerousness.

There is no evidence in the record that Lopez's trial counsel investigated or considered this report, much less made a reasoned strategic decision as to its submission. Courts have long recognized that evidence about a defendant's disadvantaged background or mental state is extraordinarily important in assessing a defendant's culpability for purposes of sentencing. *See, e.g.*, *Boyde v. California*, 494 U.S. 370, 382 (1990). The record shows that Lopez's counsel pursued a mitigation strategy of characterizing Lopez as "broken," attributing his conduct to

3

his childhood of neglect and abuse, and asking the jury to give him hope for rehabilitation by professionals and eventual parole. But the only penalty-phase evidence counsel introduced was lay witness testimony about Lopez's family from his uncle. Even as we accord counsel's performance a presumption of strategy based on the potentially aggravating content in Dr. Paglini's report—namely Lopez's admissions to crimes for which he was never charged and Dr. Paglini's conclusion that Lopez had "intense anger and rage toward society"—we cannot conclude that this strategy was reasonable. *See Correll v. Ryan*, 539 F.3d 938, 948 (9th Cir. 2008).

As the district court observed, the jury had convicted Lopez for the first-degree murder of a stranger, and the jury had already heard much of the aggravating content in Dr. Paglini's report through the state's witness who testified about Lopez's history of criminal charges and convictions as a juvenile and young adult. Much of the report's further aggravating content was also introduced at the penalty phase through detention center violation reports that documented Lopez's violent conduct and gang membership during incarceration, and Lopez's uncle's own testimony that mentioned Lopez's gang membership. As discussed in greater detail below, Dr. Paglini's report provided psychological context to Lopez's conduct by connecting it to his upbringing and explaining his stage of brain

development at the time of the murder. The report also referenced forensic psychological research supporting Dr. Paglini's opinion that Lopez's "potential for violence" could "decrease[] significantly" by the time he was eligible for parole if he "exhibited an adequate adjustment to incarceration." This, together with evidence in the report describing how Lopez's conduct improved when he lived in a more structured and stable environment, could have supported a conclusion by the jury that Lopez would adjust to life in prison over time and pose a low danger of violence at his earliest possible release date.

Because counsel's mitigation strategy was to attribute Lopez's conduct to his difficult upbringing and resulting psychological state and to ask the jury to give him hope for the possibility of parole, his failure to introduce readily available expert evidence opining that he could be capable of rehabilitation and drawing the key causal connections he asked the jury to find was not a reasonable strategic decision. *See Wiggins v. Smith*, 539 U.S. 510, 526–27 (2003).

2. To satisfy the prejudice prong of *Strickland*, Lopez "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different[,]" 466 U.S. at 694—here, that the jury would have given Lopez a sentence with the opportunity for parole. The Nevada Supreme Court found no prejudice because "any information" Dr. Paglini

5

could have provided "about appellant's family history would have been duplicative" of Lopez's uncle's testimony, and Dr. Paglini noted that Lopez "was at a high risk to be involved with violence and . . . had intense anger and rage toward society." We must defer to this finding if "fairminded jurists could disagree" about its correctness. *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Applying this standard, we conclude that the Nevada Supreme Court unreasonably applied *Strickland* because it failed to consider the significant impact that Dr. Paglini's expert psychological opinion could have had on the jury.

In focusing on the facts of Lopez's family history, the Nevada Supreme Court failed to account for a key aspect of Dr. Paglini's report: the expert opinion he provided (1) connecting Lopez's actions to his difficult childhood, (2) giving credence to the fact that he committed the crime impulsively, and (3) explaining that studies indicated a reduced risk of future dangerousness given Lopez's age at the time of the crime. Relying on psychological research, Dr. Paglini opined that, "based upon Mr. Lopez's history, he was a high risk individual to be involved in violence, and it is little wonder that such an act of violence had occurred." Dr. Paglini also explained the connection between Lopez's abusive and neglectful childhood and his violent behavior. Dr. Paglini also noted that the shooting for

6

which Lopez was convicted "impulsively occurred" and that his brain had not finished developing. Relying on scientific research, Dr. Paglini concluded that Lopez would pose a significantly decreased potential for violence at his earliest possible release date if he adequately adjusted to incarceration.

The Nevada Supreme Court unreasonably applied *Strickland* when it failed to consider or even mention this expert psychological opinion.[1] The Supreme Court has repeatedly highlighted the importance of expert medical testimony to jury sentencing decisions. *See, e.g.*, *Satterwhite v. Texas*, 486 U.S. 249, 264 (1988) (Marshall, J., concurring) ("[P]sychiatric testimony is generally of critical importance to the sentencing determination, covering issues of rehabilitative potential, future dangerousness, and individual culpability. Moreover, psychiatric testimony on these issues is clothed with a scientific authority that often carries great weight with lay juries." (footnote omitted)); *Ake v. Oklahoma*, 470 U.S. 68, 84 (1985) (characterizing the relevance of responsive psychiatric testimony to the jury as "so evident" where the government has put forth evidence of future dangerousness). While *Satterwhite* and *Ake* arise in different contexts than the one

---

[1] The dissent, too, fails to account for the important weight of this scientific evidence.

here, they make clear that expert medical testimony at the sentencing phase carries important weight with the jury.

It was unreasonable for the Nevada Supreme Court to fail to mention the potential value of Dr. Paglini's expert opinion, an opinion which could reasonably have led the jury to conclude that Lopez was not sufficiently culpable to receive a life sentence without the possibility of parole or that he would adjust to life in prison over time and pose a low danger of violence at his earliest possible release date. As the Supreme Court recognized, "developments in psychology and brain science" establish that age is relevant both to an individual's culpability and capacity for change. *Graham v. Florida*, 560 U.S. 48, 68–69 (2010); *see also Miller v. Alabama*, 567 U.S. 460, 472 n.5 (2012); *Roper v. Simmons*, 543 U.S. 551, 570 (2005). The Nevada Supreme Court's failure to consider the neuropsychological research Dr. Paglini discussed that highlighted that Lopez's brain was still developing and maturing when he committed the crime was especially unreasonable considering the Supreme Court's clear statements that age is relevant to culpability and capacity for change, two key factors in a jury's decision about granting the possibility of parole.

The Nevada Supreme Court's decision was unreasonable even considering the additional aggravating evidence Dr. Paglini's report contained. Dr. Paglini

8

contextualized this aggravating evidence by explaining that Lopez's life was "replete with mitigation" and Lopez's "abusive, neglectful substance abuse environment" turned him "into an angry young man" suffering from "depression." As described above, Dr. Paglini explained that Lopez's brain was still developing and maturing when the aggravating events took place. Further, much of the aggravating evidence had already been introduced, and Dr. Paglini's report revealed potentially exculpatory details about one of the more inflammatory criminal charges the prosecution highlighted.[2]

In sum, by focusing exclusively on the report's recounting of Lopez's "family history" and potentially aggravating information, the Nevada Supreme Court unreasonably applied *Strickland* when it "discount[ed] to irrelevance" the mitigating weight of the unique psychological evidence Dr. Paglini could have provided, especially when, as described above, that kind of evidence "may have particular salience for a jury." *Porter*, 558 U.S. at 43. And the court's failure to consider Dr. Paglini's expert opinion meant it failed to "reweigh the evidence in aggravation against the *totality* of available mitigating evidence" as required by

---

[2] Though the dissent calls the report a "double-edged sword," in part because it "disclose[d] that Lopez had failed to adjust to incarceration in the past, and instead became a violent gang member in prison," that information had already been introduced through detention center violation reports, and Dr. Paglini's report provided important context for Lopez's behavior.

Supreme Court precedent. *Wiggins*, 539 U.S. at 534 (emphasis added); *Williams v. Taylor*, 529 U.S. 362, 397–98 (2000); *Strickland*, 466 U.S. at 695. We therefore conclude that the Nevada Supreme Court's decision "involved an unreasonable application of . . . clearly established Federal law." 28 U.S.C. § 2254(d)(1). The district court properly granted the petition for a writ of habeas corpus as to the penalty phase of Lopez's trial.

**AFFIRMED.**[3]

---

[3] Respondents' unopposed motion to expand the record on appeal is **GRANTED**.

*Lopez v. Nevada Att'y Gen.*, No. 19-16973
IKUTA, Circuit Judge, dissenting:

The Supreme Court recently reminded our circuit, as it does regularly, that "a federal habeas court may not disturb the state court's decision unless its error lies beyond any possibility for fairminded disagreement." *Shinn v. Kayer*, 141 S. Ct. 517, 520 (2020) (cleaned up). Rather than apply this highly deferential standard of review, however, the panel majority has applied our circuit's now-familiar "de-novo-masquerading-as-deference approach." *Id.* at 522 (cleaned up). I therefore respectfully dissent.

The Nevada Supreme Court held that defense counsel's decision not to call Paglini to testify during the penalty phase of Lopez's trial did not prejudice Lopez under *Strickland*'s prejudice prong, and therefore did not violate Lopez's right to effective assistance of counsel. For purposes of our review, the "only question that matters" is whether that decision was not only wrong but "so obviously wrong as to be beyond any possibility for fairminded disagreement." *Id.* at 526 (cleaned up). It plainly was not.

In its de novo review of Paglini's report, the majority focuses on the aspects of the report that are most helpful to Lopez. But based on a fair reading of the report as a whole, it is a more detailed but ultimately cumulative review of the mitigating and aggravating information presented at trial. The report provides

plenty of ammunition for both prosecution and defense: it includes evidence of Lopez's harsh childhood but also highlights his "intense anger," "rage toward society," and incorrigibility when incarcerated. Paglini's report also contains evidence of Lopez's uncharged criminal conduct and violent behavior while incarcerated in a youth facility that had not been presented to the jury.

The centerpiece of Lopez's argument is the report's statement that if Lopez were "released at the age of 61, and also exhibited an adequate adjustment to incarceration, his potential for violence would have decreased significantly throughout the years." But even that statement is a double-edged sword, because the report itself discloses that Lopez had failed to adjust to incarceration in the past, and instead became a violent gang member in prison. The majority claims that Paglini's report provided important "context" for Lopez's behavior. But as the Supreme Court has observed, such context can backfire by establishing the defendant's "unpredictable propensity for violence," *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (citation omitted), and lead the jury to conclude that the defendant "was simply beyond rehabilitation," *Cullen v. Pinholster*, 563 U.S. 170, 201 (2011). Moreover, calling Paglini to testify "would have opened the door to rebuttal by a state expert." *Cullen*, 563 U.S. at 201.

"[B]ecause the *Strickland* standard is a general standard, a state court has

2

even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Under the circumstances of this case, there is no doubt that a fairminded jurist could agree with the Nevada Supreme Court's determination that there was not a reasonable probability that Paglini's report would have made a difference in Lopez's sentence. Under the "doubly deferential judicial review" required in this context, *id.*, we are compelled to conclude that the Nevada Supreme Court's determination was not an objectively unreasonable application of *Strickland*.

Because the Supreme Court's direction to us regarding AEDPA deference is clear, and because I would follow that direction, I dissent.